UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| IN RE APPLICATION OF THE UNITED STATES OF AMERICA FOR AN ORDER AUTHORIZING THE INSTALLATION AND USE OF PEN REGISTERS AND TRAP AND TRACE DEVICES ON CELLULAR TELEPHONE NUMBER 513-704-9414 | CASE NO. 1:19MJ-141<br><br>**APPLICATION**<br><br>(UNDER SEAL) |

The United States of America, moving by and through AUSA Karl P. Kadon III, its undersigned counsel, respectfully submits under seal this *ex parte* Application for an order pursuant to 18 U.S.C §§ 3122 and 3123, authorizing the installation and use of pen registers and trap and trace devices ("pen-trap devices") to record, decode, and/or capture dialing, routing, addressing, and signaling information associated with each communication to or from the cellular telephone number **513-704-9414 (Subject Telephone)**, described in Attachment A. In support of this Application, the United States asserts:

1. This is an Application, made under 18 U.S.C. § 3122(a)(1), for an order under 18 U.S.C. § 3123 authorizing the installation and use of a pen register and a trap and trace device.

2. Such an Application must include three elements: (1) "the identity of the attorney for the Government or the State law enforcement or investigative officer making the Application"; (2) "the identity of the law enforcement agency conducting the investigation"; and (3) "a certification by the applicant that the information likely to be obtained is relevant to an ongoing criminal investigation being conducted by that agency." 18 U.S.C. § 3122(b).

3. The undersigned applicant is an "attorney for the government" as defined in Rule 1(b)(1) of the Federal Rules of Criminal Procedure.

4. The law enforcement agency conducting the investigation is the Drug Enforcement Administration (DEA).

5. The applicant hereby certifies that the information likely to be obtained by the requested pen-trap devices is relevant to an ongoing criminal investigation being conducted by the DEA into Derrick BRYANT, and other as-yet- unknown individuals, in connection with possible violations of Title 21, United States Code, Sections 841(a)(1) and 846.

6. The applicant understands that the DEA and the United States Attorney's Office are directed to comply with the limitations set forth in 18 U.S.C. § 3123(c).

7. This Court is a "court of competent jurisdiction" under 18 U.S.C. § 3122(a)(2) because it "has jurisdiction over the offense being investigated," 18 U.S.C. § 3127(2)(A)(i).

8. Other than the three elements described above, federal law does not require that an Application for an order authorizing the installation and use of a pen register and a trap and trace device specify any facts. The following additional information is provided to demonstrate that the order requested falls within this Court's authority to authorize the installation and use of a pen register or trap and trace device under 18 U.S.C. § 3123(a)(1).

9. A "pen register" is "a device or process which records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted." 18 U.S.C. § 3127(3). A "trap and trace device" is "a device or process which captures the incoming electronic or other impulses which identify the originating number or other dialing, routing, addressing, and signaling information reasonably likely to identify the source of a wire or electronic communication." 18 U.S.C. § 3127(4).

## THE RELEVANT FACTS

10. The United States government, including the Drug Enforcement Administration, is investigating drug trafficking offenses. The investigation concerns possible violations of federal

2

law, including 21 U.S.C. §§ 841 and 846, by Derrick Bryant and other known and unknown individuals.

11. The conduct being investigated involves the use of cell phone number **513-704-9414** (the **Subject Telephone**). To further the investigation, investigators need to obtain the dialing, routing, addressing, and signaling information associated with communications sent to or from that cell phone number. Records obtained by the investigators indicate that Sprint provides service to the **Subject Telephone**. The **Subject Telephone** is billed under an account in the name of Jim Jones, PO Box 15955, Lenexa, Kansas. The IMEI for the phone is reported to be 358071082866970. The Sprint account was established 03/11/2017. The United States believes that this device is being utilized by Derrick BRYANT, (target subject) in distributing heroin/fentanyl/cocaine and conspiring to distribute heroin/fentanyl/cocaine, in violation of 21 U.S.C. §§ 841 and 846.

12. In August 2018, TFO Whitford and Detective Andrews met with DEA Confidential Source 1 (hereinafter "CS1"). CS1 agreed to cooperate with members of the DEA for monetary compensation. CS1 has in the past provided information proven to be accurate and whose reliability has been established to agents' satisfaction. During the meeting, CS1 stated that BRYANT has been purchasing high-value vehicles over the past few years from Dixie Imports located at 4597 Dixie Highway, Fairfield, Ohio. Several vehicles purchased by BRYANT have been cash purchases, and at least one vehicle was purchased by BRYANT, but put in another individual's name. CS1 believes BRYANT is laundering the proceeds from the sales of illegal narcotics through Dixie Imports, Inc. by purchasing expensive vehicles, some of which for large amounts of cash. CS1 provided Target Cellphone 1, as a telephone utilized by BRYANT.

13. On August 28, 2018, CS1 informed case agents that BRYANT dropped off a new enclosed trailer at the lot of Dixie Imports South, Inc., a secondary car lot owned by MOUHA.

This car lot is open to the public. CS1 stated that the trailer was put in a location on the lot that is out of view of the security cameras which oversee the car lot. On August 28, 2018, at approximately 9:00 p.m., case agents utilized Butler County Sheriff's Deputy Rhoads and K-9 "Kaiser" to conduct an open air sniff of the enclosed trailer. During the open air sniff, K-9 Kaiser gave a positive indication for the presence of narcotics emitting from the trailer.

14. On August 29, 2018, a second DEA Confidential Source (hereinafter "CS2") contacted TFO Whitford. CS2 has agreed to cooperate with members of the DEA for judicial consideration, and has in the past provided information proven to be accurate and whose reliability has been established to agents' satisfaction. Case agents met with CS2 to conduct a debriefing. During the debriefing, CS2 stated that a shipment of heroin had just arrived in Cincinnati, Ohio, and that BRYANT was in need of a secure location to store the controlled substances. Based on the above facts, I believe that the enclosed trailer may have been utilized to transport the shipment of heroin into Cincinnati, Ohio.

15. On September 18, 2018, CS2 contacted TFO Whitford and stated that a meeting with Andre ROBINSON, who agents believe is a co-conspirator of BRYANT's, would take place at Bargo's bar and grill restaurant in Fairfield, Ohio, at approximately 9:00 p.m. that evening.

16. At approximately 9:51 p.m., CS2 contacted TFO Whitford and stated that ROBINSON requested CS2 obtain two money counter machines. ROBINSON explained to CS2 that he (ROBINSON) has two acquaintances that are currently distributing heroin. CS2 indicated that the acquaintances need money counters to count the proceeds from illegal narcotics distribution: large sums of U.S. currency.

17. On September 24, 2018, at approximately 4:25 p.m., TFO Whitford met with the Honorable Stephanie K. Bowman, U.S. Magistrate Judge, Southern District of Ohio, and presented a search warrant authorizing the use of a DEA owned GPS equipped money counter. Magistrate

4

Judge Bowman signed the search warrant. On September 26, 2018, members of the DEA conducted an undercover operation utilizing CS2. During this operation, CS2 delivered the money counter to ROBINSON. On September 26, 2018, at approximately 10:00 p.m., CS2, followed by TFO Whitford and Detective Andrews, met with ROBINSON at the Bargo's bar and grill restaurant located in Fairfield, Ohio. This meeting between CS2 and ROBINSON was consensually recorded by CS2. At approximately 10:07 p.m., TFO James Whitehouse and DEA Special Agent (SA) Joseph Reder observed CS2 arrive to the parking lot of the restaurant. As soon as CS2 exited the vehicle, CS2 was greeted by ROBINSON. CS2 exited the vehicle and retrieved the box containing the money counter and placed it into ROBINSON's vehicle. Following the meet, CS2 stated that upon arrival at the restaurant, CS2 exited the vehicle and met with ROBINSON. At that time, CS2 provided the money counter to ROBINSON, which was placed into ROBINSON's vehicle. CS2 stated ROBINSON and CS2 went into the restaurant and engaged in conversation. During the conversation, ROBINSON and CS2 discussed who would utilize the counter machine. ROBINSON made mention of a male who has a McLaren and Rolls Royce and has a lot of money as the person who will use "the machine." Case agents are aware that BRYANT owns both of these cars. Based on the above information, I believe ROBINSON is a member of the BRYANT DTO. I believe ROBINSON facilitates BRYANT's drug trafficking and money laundering activities by providing the DTO with money counting machines used to count drug proceeds.

18.     On September 28, 2018, at approximately 7:13 p.m., a batch report was created (00122-0136-000), which displays U.S. Currency being processed through the DEA-owned money counter. At approximately 7:44 p.m., the money counter displayed a physical address of 11922 Hamilton Ave., Cincinnati, Ohio, 45231. This is the physical address of the Prime Cuts Barber & Beauty Salon owned by BRYANT.

19. On September 29, 2018, at approximately 7:32 a.m., the money counter displayed an address of 9812 Beech Drive, Cincinnati, Ohio. This is the known residence of BRYANT. Case agents believe, through covert electronic surveillance and recorded calls made between CS2 and ROBINSON, ROBINSON transported the money counter to 11922 Hamilton Ave., Cincinnati, Ohio, and provided BRYANT with the money counter. Once the money counter was observed by BRYANT at the barber shop, it is believed that BRYANT took possession of the money counter and transported it to his (BRYANT's) residence located at 9812 Beech Drive, Cincinnati, Ohio. To date, this money counter has processed over $870,000.00 U.S. Currency.

20. On October 3, 2018, TFO Whitehouse spoke with Detective Flick of the West Chester Police Department. Detective Flick advised TFO Whitehouse that he (Detective Flick) had conducted a confidential source debrief over the past twelve months. According to Detective Flick, this confidential source (hereinafter "CS3") has in the past provided information proven to be accurate and whose reliability is established to Detective Flick's satisfaction. During the debriefing conducted by Detective Flick, CS3 stated that he/she was purchasing cocaine from BRYANT. CS3 stated that he/she had in the past purchased multiple ounces of cocaine at a time from BRYANT. Typically, CS3 would meet with BRYANT at a barber shop (Prime Cuts) and inform BRYANT how much cocaine CS3 wished to purchase, while getting a haircut. Later CS3 would then meet with BRYANT in a residential area to conduct the final transaction of the cocaine. CS3 stated that BRYANT was in possession of anywhere from five to ten kilograms of cocaine at a time and would store the kilograms in a deep freezer in his (BRYANT's) residence. CS3 believes that BRYANT will not openly discuss his drug trafficking activities on the telephone; rather, BRYANT prefers to discuss his illicit business in person. BRYANT is believed to utilize telephones to coordinate the in-person meetings with co-conspirators.

21. On December 19, 2018, BRYANT, utilizing the **Subject Telephone**, and CS3 began communicating via text message (Apple iMessage) to coordinate a meet with CS3 to discuss future drug transactions in person.

22. Based on the aforementioned facts and reporting, Agents believe BRYANT is using the **Subject Telephone** to commit federal narcotics offense.

23. The requested information will assist law enforcement in identifying the location of Derrick BRYANT, which is relevant in locating a source of supply, identifying locations where narcotics and contraband are being stored, and identifying additional subjects

24. The conduct being investigated involves use of the cellular telephone number described in Attachment A. To further the investigation, investigators need to obtain the dialing, routing, addressing, and signaling information associated with communications sent to or from that cellular telephone number.

25. The pen-trap devices sought by this Application will record, decode, and/or capture dialing, routing, addressing, and signaling information associated with each communication to or from the cellular telephone number described in Attachment A, including the date, time, and duration of the communication, and those items listed in Attachment B, without geographic limit.

26. In the traditional telephone context, pen registers captured the destination phone numbers of outgoing calls, while trap and trace devices captured the phone numbers of incoming calls. Similar principles apply to other kinds of wire and electronic communications, as described below.

27. A cellular telephone, or cell phone, is a mobile device that can transmit and receive both wire and electronic communications. Individuals using cellular telephones contract with cellular service providers, who maintain antenna towers covering specific geographic areas. In order to transmit or receive calls and data, a cellular telephone must send a radio signal to an

7

antenna tower that, in turn, is connected to a cellular service provider's network. A cellular telephone connected to a cellular service provider's network can thus act much like a traditional landline telephone and a computer. This Application seeks both traditional telephone calling data (i.e., telephone numbers dialed and dialing the target device), as well as data related to the dialing, routing, addressing and signaling of electronic communications sent to and from the target device.

28. In addition to a unique telephone number, each cellular telephone has one or more unique identifiers embedded inside it. Depending upon the cellular network and the device, the embedded unique identifiers for a cellular telephone could take several different forms, including an Electronic Serial Number ("ESN"), a Mobile Electronic Identity Number ("MEID"), a Mobile Identification Number ("MIN"), a Subscriber Identity Module ("SIM"), an International Mobile Subscriber Identifier ("IMSI"), a Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"), or an International Mobile Station Equipment Identity ("IMEI"). When a cellular telephone connects to a cellular antenna or tower, it reveals its embedded unique identifiers to the cellular antenna or tower, and the cellular antenna or tower receives and forwards those identifiers to the core network as a matter of course. The unique identifiers—as transmitted from a cellular telephone to a cellular network—are similar to telephone numbers in that they are used by the cellular provider to identify, authenticate, and/or route the communications. They can be recorded by pen-trap devices and indicate the identity of the cellular telephone device making the communication without revealing the communication's content.

29. In addition, a list of incoming and outgoing telephone numbers is generated when a cellular telephone is used to make or receive calls, or to send or receive text messages (which may include photographs, videos, and other data). These telephone numbers can be recorded by pen-trap devices and then used to identify the parties to a communication without revealing the communication's contents.

## ELECTRONIC COMMUNICATIONS

30. The Internet is a global network of computers and other devices. On the Internet, data transferred between devices is not sent as a continuous stream, but rather it is split into discrete packets. Generally, a single communication is sent as a series of data packets. When the packets reach their destination, the receiving device reassembles them into the complete communication. Each packet has two parts: a header with routing and control information, and a payload, which generally contains user data. The header contains non-content information such as the packet's source and destination Internet Protocol (IP) addresses[1], source and destination port numbers[2], transport protocol[3], flow label[4] (when IPv6 applies), and the packet's size[5]. The payload usually includes the content of the transmitted communication – for example, part of the text of an e-mail message or the data that makes up part of an electronic image.

31. Cellular phones can connect to the Internet via the cellular network. They can then be used to browse the World Wide Web, send e-mail messages, and engage in other forms of

---

[1] A numerical label that identifies the source or terminating device on an IP network transmitting an individual packet associated with a communication.

[2] Port numbers of the IP packet uniquely identify different applications or processes running on a single device (the source or destination device) and enable the devices to share a single physical connection to a network. This parameter is also used by communication providers for routing of IP packets when utilizing Network Address Translation (NAT), which is common among cellular telephone providers. The source and destination ports are numerical labels that identify the endpoints at the source and destination devices on an IP network transmitting an individual packet associated with a communication. When combined with the source and destination IP addresses, this routing information identifies the source transmitting an IP packet and the destination receiving the IP packet.

[3] The transport protocol defines the protocol used in the data portion of the IP packet. One example is the Transport Control Protocol, or TCP, which is one of the core protocols of the Internet Protocol suite. TCP provides reliable, ordered and error-checked delivery of a stream of octets between programs running on computers connected to a local area network, intranet or the public Internet.

[4] The field in the IPv6 header that is used by a source to label packets of a flow to avoid disruption during reassembly. This can facilitate such processes as streaming online video or audio feeds. The flow label can be used to indicate to routers and switches with multiple outbound paths that the listed packets should stay on the same path so that they will not be reordered.

[5] The field that defines the entire packet size, including header and data, in bytes.

electronic communications, just like desktop computers. When connecting through the cellular network, Internet communications sent and received by a cellular phone will contain some of the same unique identifiers that identify cellular voice communications, such as an ESN, MEID, MIN, SIM, IMSI, MSISDN, or IMEI. Internet communications sent to and from a cellular phone also contain the header information referenced above in each data packet, such as the source and destination IP addresses and the source and destination port numbers associated with that cellular phone at the specific time of the communication. Each of these unique identifiers can be used to identify devices that are party to a communication without revealing the communication's contents. The IP addresses and port numbers recorded in the headers of data packets also are readily available to the cellular service provider in each and every data packet (if they were not, the packets could not be routed to and from their destinations), and can easily be extracted by a pen register and trap and trace device.

32. On the Internet, IP addresses and port numbers function much like telephone numbers and area codes – often both are necessary to route a communication. Devices directly connected to the Internet are identified by a unique IP address. This number is used to route information between devices. Generally, when one device requests information from a second device, the requesting device specifies its own IP address so that the responding device knows where to send its response. Both the IP address of the requesting device (the source IP address) and the IP address of the receiving device (the destination IP address) are included in specific fields within the header of each packet of data sent over the Internet. Source and destination port numbers are also included in specific fields within the headers of data packets. Sometimes these port numbers identify the type of service that is connected with a communication (for example email or web-browsing), but often they identify a specific device on a private network. In either case, port numbers are used to route data packets either to a specific device or a specific process

running on a device. Thus, in both cases, port numbers are used by computers to route data packets to their final destinations.

33. The headers of data packets also contain other dialing, routing, addressing and signaling information. This data includes the transport protocol used (there are several different transport protocols that provide transport of data over networks); the flow label (which helps control the path and order of transmission of packets in certain circumstances - for example the packets that make up streaming video that must be placed in a certain order once received); and the packet size (used to identify the size of each data packet).

34. Because they are all used to facilitate the routing and transfer of data, and because they do not contain the content of communications, the United States requests that this Court order Sprint to either produce, or assist the United States in obtaining through the installation of a Pen Trap device, the IP addresses, port numbers, transport protocol, flow label and packet size of each data packet sent to and from the target device. See 18 U.S.C. §§ 3122 and 3123.

35. The United States further requests that the Court order SPRINT to provide other data related to each data packet sent over the provider's network. These data fields are commonly provided by cellular telephone providers pursuant to industry standards adopted under the Communications Assistance for Law Enforcement Act (CALEA). See 47 U.S.C. § 1006. They include: the Case Identification (or Case ID), which is a unique identifier used by law enforcement and the provider to identify the case to which the data pertains; the Intercept Access Point System Identification (IAP System ID), which identifies the network equipment responsible for isolating the targeted information; the Timestamp, which identifies the date and time that the event was detected; and the Correlation Number, which provides a unique identifier for the call data that is used to correlate the communication identifying information with the communication content.

**GOVERNMENT REQUESTS**

36. For the reasons stated above, the United States requests that the Court enter an Order authorizing the installation and use of pen-trap devices to record, decode, and/or capture the dialing, routing, addressing, and signaling information described above for each communication to or from the cellular telephone number described in Attachment A, to include the date, time, and duration of the communication, and those items listed in Attachment B, without geographic limit. The United States does not request and does not seek to obtain the contents of any communications, as defined in 18 U.S.C. § 2510(8).

37. Based on the specific and articulable facts set forth above, pursuant to Title 18, United States Code, Sections 2703(c)(1)(B), 2703(c)(2) and 2703(d), the United States requests that SPRINT be ordered to supply subscriber information (including the names and addresses of the subscriber, whether listed or unlisted, billing information, payment information, subscriber date of birth, subscriber driver license number, subscriber social security number, equipment information, shipment information, call detail records, information related to calls made via direct connect features, calls to destination search (or "reverse dumps"), and periods of telephone activation) for all numbers dialed or connections made to and from the cellular telephone number described in Attachment A captured by the pen register or trap and trace devices on the cellular telephone number described in Attachment A.

38. The United States further requests that the Court authorize the foregoing installation and use for a period of sixty (60) days from the date of the Court's Order, pursuant to 18 U.S.C. § 3123(c)(1).

39. The United States further requests, pursuant to 18 U.S.C. §§ 3123(b)(2) and 3124(a)-(b), that the Court order SPRINT and any other person or entity providing wire or electronic communication service in the United States whose assistance may facilitate execution of this Order to furnish, upon service of the Order, information, facilities, and technical assistance

necessary to install the pen-trap devices, including installation and operation of the pen-trap devices unobtrusively and with minimum disruption of normal service. Any entity providing such assistance shall be reasonably compensated by the DEA, pursuant to 18 U.S.C. § 3124(c), for reasonable expenses incurred in providing facilities and assistance in furtherance of this Order.

40. If SPRINT, or any other relevant provider of electronic communication service to the public, cannot comply with this Court's Order to install the pen-trap devices, the United States requests authorization to install and use its own pen register and trap and trace devices on the data network of SPRINT, or any other relevant provider of electronic communication service to the public, pursuant to 18 U.S.C. § 3123(a)(3)(A).

41. The United States further requests, pursuant to 18 U.S.C. §§ 3123(b)(2) and 3124(a)-(b), that the Court order SPRINT and any other person or entity providing wire or electronic communication service in the United States whose assistance may facilitate execution of this Order, to furnish immediate technical assistance to the DEA to accomplish the interception of all of the dialing, routing, addressing, and signaling information for all data packets associated with each communication to or from the target device, including the date, time and duration of the communication; and to deliver all such intercepted dialing, routing, addressing, and signaling information, securely and reliably and in a format that allows the information to be understood by the applicant. In particular, the United States requests that SPRINT and any other person or entity providing wire or electronic communication service in the United States shall provide the following:

- Any requested technical documentation and necessary assistance to enable the DEA to ascertain the meaning and significance of data in the delivery; to facilitate breaking down the information into distinct identifiable fields; and to address deficiencies and preferences with formats.

- A designated technical representative(s)/engineer(s) who will coordinate efforts with and have the authority to provide the DEA technical staff the necessary information and technical assistance, including direct access to the network facilities used or controlled by or on behalf of the DEA, and any other person or entity providing wire or electronic communication service in the United States to the target device, for purposes of testing, evaluation and implementation of the technical means necessary to accomplish the authorized pen register and a trap and trace device or process.

42. The United States further requests that the Court order SPRINT and any other person or entity whose assistance may facilitate execution of this Order to notify the applicant and the DEA of any changes relating to the cellular telephone number described in Attachment A, including changes to the International Mobile Subscriber Identifier ("IMSI") and/or the International Mobile Station Equipment Identity ("IMEI"), to include changes to subscriber information; and to provide prior notice to the applicant and the DEA before terminating or changing service to the cellular telephone number.

43. The United States further requests that the Court order that the DEA and the applicant have access to the information collected by the pen-trap devices as soon as practicable, twenty-four hours per day, or at such other times as may be acceptable to them, for the duration of the Order.

44. The United States further requests, pursuant to 18 U.S.C. § 3123(d)(2), that the Court order SPRINT and any other person or entity whose assistance facilitates execution of this Order, and their agents and employees, not to disclose in any manner, directly or indirectly, by any action or inaction, the existence of this Application and Order, the resulting pen-trap devices, or

this investigation, unless and until authorized by this Court, except that SPRINT may disclose this Order to an attorney for SPRINT for the purpose of receiving legal advice.

45. The United States further requests that this Application and any resulting Order be sealed until otherwise ordered by the Court, pursuant to 18 U.S.C. § 3123(d)(1).

46. The United States further requests that the Clerk of the Court provide the United States Attorney's Office with three certified copies of this Application and Order, and provide copies of this Order to the DEA and SPRINT upon request.

47. The foregoing is based on information provided to me in my official capacity by agents of the DEA.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 26th day of FEBRUARY 2019.

Respectfully submitted,

BENJAMIN C. GLASSMAN
United States Attorney

*s/Karl P. Kadon III*
KARL P. KADON III (0009324)
Assistant United States Attorney
221 East Fourth Street, Suite 400
Cincinnati, Ohio 45202
Office: (513) 684-3711
Fax: (513) 684-2047
E-mail: Karl.Kadon@usdoj.gov